# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **ROBERT C. HUFFMAN,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:17cv00032 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **DR. McCARTHY, et al.,** | ) | |
| Defendants | ) | |

The plaintiff, Robert C. Huffman, ("Huffman"), an inmate formerly incarcerated at Pocahontas State Correctional Center, ("PSCC"),[1] and proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging that the defendants, all of whom are employees of the Virginia Department of Corrections, ("VDOC"), or are VDOC contracted medical service providers, have been deliberately indifferent to his serious medical needs, in violation of his Eighth Amendment rights. Huffman seeks monetary and injunctive relief. This case is before the court on Huffman's motions for preliminary injunctive relief, (Docket Item Nos. 9, 31, 55), defendant Henry Ponton, Jr.'s, Motion To Dismiss, (Docket Item No. 13),[2] and the defendants' motions for summary judgment claiming Huffman's claims should be dismissed for failure to exhaust his administrative remedies, (Docket Item Nos. 10, 25). An evidentiary hearing was held before the undersigned on June 26-27, 2017. Based on the evidence before the court, I will enter summary judgment in the defendants' favor.

---

[1] By letter dated July 18, 2017, Huffman informed the court that he had been transferred from PSCC to Bland Correctional Center. (Docket Item No. 81.)

[2] Because the court has considered information outside of the pleadings, this motion to dismiss will be treated as a motion for summary judgment. *See* FED. R. CIV. P. 12(d).

*I. Facts*[3]

Huffman is a VDOC inmate formerly housed at PSCC. He claims that he has been denied necessary medical treatment for pudendal nerve entrapment, ("PNE"). At the evidentiary hearing, Huffman testified that he had suffered from PNE or neuralgia for about 20 years as a result of an old work injury. He said that he had undergone numerous treatments, including surgeries, nerve blocks and botox injections, in an effort to get his condition to a manageable state. He testified that sitting on hard surfaces without a donut cushion aggravated his problem and that hot water therapy eased his pain.

In support of their motions for summary judgment, the defendants have supplied a sworn affidavit from C. Smalling, the Human Rights Advocate at PSCC, a copy of Operating Procedure, ("OP"), 866.1, which governs the Offender Grievance Procedure, and a copy of Huffman's grievance file. (Docket Item No. 26-1) (Smalling Affidavit). According to Smalling, as Human Rights Advocate at PSCC, she is responsible for maintaining grievance files on offenders housed at PSCC. Smalling stated that OP 866.1 provides a mechanism by which offenders resolve complaints, appeal administrative decisions and challenge the substance of procedures. (Encl. A to Smalling Affidavit, ("OP 866.1"), at 1, 5.) All issues are grievable except those pertaining to policies, procedures and decisions of the Virginia Parole Board, disciplinary hearings, state and federal court decisions, laws

---

[3] On a motion for summary judgment, the court may review a number of materials to determine whether a genuine dispute of any material fact exists, including sworn testimony, affidavits, sworn pleadings, discovery responses and other materials contained in the record. *See* FED. R. CIV. P. 56(C).

and regulations and other matters beyond the control of the VDOC. (Smalling Affidavit at 2; OP 866.1 at 9.)

According to Smalling, grievances which do not meet the filing requirements of OP 866.1 are returned to the offender within two working days from the date of receipt, noting the reason for return on the intake section of the grievance form. (Smalling Affidavit at 2; OP 866.1 at 8.) The offender is instructed how to remedy any problems with the grievance when feasible. (Smalling Affidavit at 2.) A copy is made of all grievances returned to the offender with the justification for return noted on the second page of the grievance form. (Smalling Affidavit at 2-3.) If an offender wishes review of the intake decision on any grievance, he may send the grievance to the applicable Regional Ombudsman within five calendar days of receipt for a determination. (Smalling Affidavit at 3; OP 866.1 at 8.) There is no further review of the intake decision. (Smalling Affidavit at 3; OP 866.1 at 8.) A review of OP 866.1 shows that it requires complete exhaustion. OP 866.1 states:

> An offender meets the exhaustion of remedies requirement only when a Regular Grievance has been carried through the highest eligible level of appeal without satisfactory resolution of the issue.
> … If a Regular Grievance does not meet the criteria for acceptance and review by the Regional Ombudsman does not result in intake into the grievance process, the issue must be resubmitted in accordance with the criteria for acceptance. The exhaustion of remedies requirement will be met only when the Regular Grievance has been accepted into the grievance process and appealed through the highest eligible level without satisfactory resolution of the issue.

(OP 866.1 at 6.)

Prior to submitting a regular grievance, the offender must demonstrate that he has made a good faith effort to informally resolve his complaint, which may be accomplished by submitting an informal complaint to the Grievance Department at the appropriate institution. (Smalling Affidavit at 2; OP 866.1 at 6.) The informal complaint will then be forwarded to the appropriate department head. (Smalling Affidavit at 2.) Prison staff should respond to an informal complaint within 15 calendar days to ensure that informal responses are provided prior to the expiration of the 30-day time period in which an offender may file his regular grievance. (Smalling Affidavit at 2; OP 866.1 at 7.) Regular grievances are to be submitted within 30 days from the date of the occurrence/incident. (Smalling Affidavit at 2.) Only one issue may be addressed per grievance. (Smalling Affidavit at 2; OP 866.1 at 7.) The grievance must include any required documentation, including the informal complaint, showing the offender's attempt to informally resolve the issue. (Smalling Affidavit at 2; OP 866.1 at 7.)

There are three possible levels of review available for regular grievances that are accepted at intake. (Smalling Affidavit at 3; OP 866.1 at 8.) Level I reviews are conducted by the Warden or Superintendent of the facility where the offender is located. (Smalling Affidavit at 3; OP 866.1 at 9.) If the offender is dissatisfied with the Level I determination, he may appeal to Level II. (Smalling Affidavit at 3.) Level II reviews are conducted by the Regional Administrator, Health Services Director or Chief of Operations for Offender Management Services or Superintendent for Education. (Smalling Affidavit at 3; OP 866.1 at 9.) For most issues, Level II is the final level of review. (Smalling Affidavit at 3.) For those issues appealable to Level III, the Chief of Corrections Operations or Director of the VDOC conducts a review of the regular grievance. (Smalling Affidavit at 3; OP 866.1 at 10.) The time limit for issuing a Level I response is 30 days, 20 days

for a Level II response and 20 days for a Level III response. (Smalling Affidavit at 3; OP 866.1 at 10.) Expiration of the time limit without issuance of a response at any stage of the process automatically qualifies the grievance for appeal to the next level of review. (Smalling Affidavit at 3; OP 866.1 at 11.)

Smalling stated that she had reviewed the grievance records for Huffman and determined that he did not submit any regular grievances that were accepted at intake regarding denial of necessary medical treatment for his PNE. (Smalling Affidavit at 5.) She, therefore, concluded that Huffman had not exhausted his administrative remedies with regard to the issues pending before the court. (Smalling Affidavit at 5.)

Smalling also testified at the evidentiary hearing that issues regarding inmate medical treatment and devices were grievable. Smalling stated that Huffman was oriented to the Inmate Grievance Procedure when he arrived at PSCC and completed a form acknowledging that he did receive this orientation. (Defendants' Exhibit No. 5 (Docket Item No. 76-5)). Smalling testified that Defendants' Exhibit No. 6, (Docket Item No. 76-6), was the Grievance Procedure portion of the Offender Orientation Manual given to Huffman when he was transferred to PSCC.

In her testimony, Smalling admitted that Huffman filed an Informal Complaint regarding his medical condition on May 24, 2014. (Plaintiff's Exhibit No. 5.) The Informal Complaint form indicated that it was received by the Medical Department on May 26, 2016, and that it was responded to by Nurse C. Cline on the same day that it was received. Smalling admitted that Huffman filed a Regular Grievance on June 22, 2016, (Plaintiff's Exhibit No. 6), which she rejected at intake as being untimely filed. (Plaintiff's Exhibit No. 7). Smalling said that she

rejected the Grievance as being untimely filed because in his Informal Complaint Huffman complained regarding a change in his medical location code, which occurred when he was transferred to PSCC, more than 30 days prior to filing the Grievance. Smalling conceded that, in the section where Huffman listed the action he wanted taken in response to his Grievance, Huffman did not seek any change in his medical location code. Instead, he sought medical treatment for his PNE and a donut cushion.

In his Complaint, Huffman stated that he had exhausted his administrative remedies with regard to his claims, in that he had filed an informal complaint form regarding his claims on May 24, 2016, which did not grant the relief requested. He then filed a regular grievance form on June 22, 2016, which was rejected as untimely. He then appealed this decision on intake to the Regional Ombudsman. The Ombudsman upheld the intake decision. Huffman does not allege that he filed any other informal complaints and/or regular grievances related to his § 1983 claims contained in his Complaint.

Huffman testified that he came into VDOC custody in February 2016 and was transferred to PSCC in April 2016. He said that, prior to arriving at PSCC, he was held at VDOC's facility in Dillwyn. Huffman said that he received a physical examination upon his arrival at Dillwyn, and he was housed in the medical unit there. Huffman said that he was given hydrocodone, which he had taken for years, to manage his pain, and he was allowed to sit on a pillow while at Dillwyn.

Huffman stated that, when he arrived at PSCC on April 6, 2016, he was told that, "per DOC policy," he would be tapered off his narcotic medication. Huffman's DOC medical file supports this testimony. (Plaintiff's Exhibit No. 2 at

1 (Docket Item No. 73-2 at 1)). Huffman's medical record notes that a review of his medical record was conducted on April 7, 2016, and his medical location code was changed to an "A." (Plaintiff's Exhibit No. 2 at 2.) Huffman testified that he was housed in medical isolation for the first two weeks he was housed at PSCC. He said that he was told that he could not leave medical isolation until he had been off of narcotic medication for eight days. Huffman said that he refused his pain medicine in an effort to get out of medical isolation.

Huffman testified that the first time he saw Dr. Matthew McCarthy at PSCC, Dr. McCarthy told him "don't curse me because I took your pain medication, they won't allow it here at Pocahontas." Huffman said that Dr. McCarthy wanted to prescribe antiseizure and antidepressant medication, but he informed Dr. McCarthy that those medications had made his symptoms worse and had caused urinary tract problems in the past. Huffman also said that those medications made his face, arms and legs go numb and tingle and caused him difficulty breathing. Huffman said that, at this first meeting, he requested a donut cushion to sit on. Huffman said that Dr. McCathy told him that he, Huffman, should not have been transferred to PSCC because the prison's policy and pharmaceutical formulary would not allow him to treat Huffman's PNE.

Huffman testified that he was transferred to general population without a donut cushion to sit on and with only Tylenol for pain relief. Huffman stated that he began to experience severe pain and numbness in his groin area and bladder problems as a result. Huffman said that he saw Dr. McCarthy again on May 18, 2016, and Dr. McCarthy told him there was really nothing he could do for him, other than advise him to take Tylenol for pain. Huffman said that he requested that

Dr. McCarthy recommend that he receive a donut cushion to sit on, and Dr. McCarthy refused.

Huffman testified that he filed an Informal Complaint form on May 24, 2016, complaining about his lack of medical treatment. The Informal Complaint, (Plaintiff's Exhibit No. 5 (Docket Item No. 73-5)), stated:

> I am upset with how my medical conditions just seem to be ignored at this facility. I suffer a very rare and very painful (in many ways) neurological disorder, called (PNE) pudendal nerve entrapment. Feel sure I'm the only one in the system with this condition. I have been disabled for 17 [years] from … multiple surger[ies], multiple [doctors], hospitals, including the Mayo Clinic. Every other facility has tried to help me. I'm told here there is nothing that will be done for me. My problems just can't be ignored. Wish they could. Intake classified me as [medical] D lower bunk. That's been ignored here also. All [medications] taken. I don't know what is expected of me.

On May 26, 2016, Nurse C. Cline responded: "Your medical location code is [an] A. You do not meet criteria for a bottom bunk order. Dr. McCarthy has offered pain medication to you and you declined."

Huffman testified that, at Dillwyn, he was housed on the lower tier. At PSCC, he was housed on the top tier and the top bunk. He said that the only pain medication he ever refused was Tylenol or ibuprofen. He said he refused this medication at pill call on occasion because he had purchased it from the commissary and had it available to take as necessary.

Huffman testified that he saw Dr. McCarthy again on June 20, 2016, in severe pain and having bladder control problems. He said that he asked for a donut

cushion and a lower bunk. He said that Dr. McCarthy told him that security would not allow him to have a donut cushion. Also, he said that Dr. McCarthy told him that "they" would not allow Huffman to have a bottom bunk, but Dr. McCarthy would never say who "they" were.

Huffman testified that he filed a Regular Grievance Form on June 22, 2016, seeking medical treatment. (Plaintiff's Exhibit No. 6 (Docket Item No. 73-6).) This Regular Grievance stated,

> My nerve damage/neurological condition continues to worsen. I am in severe pain most all the time now, and numb [throughout] my genitals, rectum, bladder, etc. (Those are the side effects of this condition when left untreated.) I have not experienced the numbness to this extent for years. Also Bladder leakage often. As I have already stated, this is a illness/condition over 17 years old. I have been legally disabled for years from this. I've had bladder surgery, my prostate removed, morphine pumps implanted, spinal cord stimulators implanted, trips to the Mayo Clinic for nerve treatment and much more. I do not understand why my medical classification changed only at this facility. Nor do I understand why all the other facilities treated my problems & this one will not. The only [medication] I refused was Tylenol.  Due to I'm on a large dose of Motrin already, and the [doctor] is monitoring my liver, and we had decided to give the Tylenol a break. Tylenol [and] Motrin will not in any way treat my problems. If they would, I would never have had my prostate removed.

Huffman wrote the following for the action he wanted taken:

> I want my condition recognized and not brushed off as if it will go away. I wish it would, but it won't. I need treatment for my problems, treatment beyond a Motrin. Certain daily [activities] contribute to the problem [a]lso, but no one will work with me. I can not sit. This causes me major problems fast. I've ask[ed] for a donut

to sit on, and refused that. Also refused a bottom bunk. If I can't be treated here, please move me back to where I can be.

Huffman testified that this Regular Grievance was rejected at intake by Smalling on June 30, 2016, as having been filed after the filing period expired. (Plaintiff's Exhibit No. 7 (Docket Item No. 73-7)). Smalling wrote on the Intake response: "location code changed in April 2016." Huffman said that he appealed the intake decision, and it was upheld on July 12, 2016. (Plaintiff's Exhibit No. 7.)

On June 22, 2016, Huffman also filed a Request for Service Form with the Chief of Security at PSCC. (Plaintiff's Exhibit No. 8 (Docket Item No. 73-9)). On this form, he wrote: "Due to me having long term nerve damage that sitting on hard surfaces aggravates quickly, I would like to be able to have a pillow or [donut] to sit on during my visitations. Even if I could just use my own pillow from the pod. Please let me know if this can be arranged. I really wasn't sure who to address this issue with." Major R. Bishop responded, "No" on June 27, 2016. (Plaintiff's Exhibit No. 8.)

On June 22, 2016, Huffman also filed a Request for Service Form with the Building Sergeant. (Plaintiff's Exhibit No. 9 (Docket Item No. 73-10)). On this form, Huffman wrote: "I would like to have permission to bring my pillow out during pod rec to sit on it. This nerve damage I have keeps me from being able to sit on any hard surfaces for any length of time. With my pillow or a donut to sit on, I could possibly sit in the pod at times for a while." B. Dunford responded: "Not approved" on June 23, 2016.

Huffman testified, that after this, he requested a lower tier cell assignment from his unit sergeant, and the unit sergeant said "no problem." When the unit sergeant looked at Huffman's medical status on the computer, however, he told Huffman that it said he had no medical issues. Huffman said that the unit sergeant told him he would have to take it up with the Medical Department.

Huffman testified that his mother, Shirley Huffman, wrote a letter on his behalf to defendant Barry Marano on July 10, 2016, outlining Huffman's request for medical treatment. (Plaintiff's Exhibit No. 10 (Docket Item No. 73-11)).

Huffman said that, on July 14, 2016, he asked M.A. Yates if he could have a cushion to sit on during reentry classes. He said that Yates told him, "security won't allow it." Huffman said he then asked if he could just stand up during the classes.

Huffman testified that he was seen by Dr. McCarthy again on August 10, 2016, in severe pain and extreme physical distress with total numbness in his groin/genitals area. He said that he had begun urinating on himself and had become impotent. Huffman said that he did not ask to receive narcotics; nor did he refuse any testing. Instead, Huffman testified that he requested some type of treatment for his condition. Huffman said that he saw Dr. McCarthy again on August 15, 2016, and Dr. McCarthy said, "I have already told you there is nothing I can do for you." Huffman said that he saw Dr. McCarthy again on September 19, 2016, and Dr. McCarthy offered him ibuprofen. Huffman said that he told Dr. McCarthy he already had ibuprofen. He said that Dr. McCarthy falsely wrote that he asked for narcotics on that date.

Huffman said that he spoke to Yates again on November 4, 2016, and was told that security concerns would "override" any medical decision on giving him a cushion to sit on. He said that he saw Dr. McCarthy again on November 16, 2016, in a high level of pain and stressed the severity of his condition. He said that Dr. McCarthy told him that he could give him over-the-counter medication and Elavil.

Huffman said that he had a telemed appointment with a neurologist, Dr. Prachi Mehndiratta, on November 18, 2016. The physician asked Huffman if he had tried to take Cymbalta for his symptoms in the past, and Huffman told her that he could not tolerate Cymbalta. He specifically denied asking for any narcotic medication; instead, he said that he asked only for help. According to her medical records, Dr. Mehndiratta recommended that Huffman receive a small cushion to sit on and be referred for physical therapy and pain management. (Plaintiff's Exhibit No. 19, (Docket Item No. 73-23)).

Huffman said that he saw Dr. McCarthy again on December 21, 2016, in excruciating pain with bladder control problems. He said that, on this date, Dr. McCarthy told him that "Richmond" had denied sending him for a pain management consultation or for physical therapy. Dr. McCarthy also told him that security would not allow him to have a donut cushion.

Huffman testified that he was in severe pain when he saw Dr. McCarthy again on April 12, 2017. He said that he had been told that medical was trying to find a pain management center to see him, but that no one would see him locally. Huffman said that he asked about being taken to see Dr. Bakhit, a pain management specialist who had treated him in the past. Huffman said that Dr.

McCarthy told him that Dr. Bakhit had closed his clinic and possibly lost his license to practice medicine.

Huffman admitted that he was given a seat cushion on March 10, 2017. He said that he was taken to see Dr. Bakhit the week prior to the June hearing, and Dr. Bakhit prescribed Ultram for him, which he had taken for three days prior to the hearing. Huffman said that no one had offered him Ultram previously, even though he had told Dr. McCarthy that he could take it. He said that Dr. McCarthy had told him that prescribing Ultram was "against policy." Huffman said that he had not been offered any physical therapy and was told that "Richmond" would not approve it. Huffman said that he was granted a bottom tier cell with a bottom bunk in January 2017.

Huffman said that, since receiving the donut cushion, he wore his coat and concealed the cushion under his coat so that other inmates would not see it. He said that he did not take the donut cushion with him to pill call or to the law library because he did not sit down in either place. He further testified, however, that, since receiving the cushion, that he never sat in his pod without sitting on the cushion.

On cross-examination, Huffman conceded that none of the physicians he had seen since being housed a PSCC had recommended that he receive narcotic pain medication other than Dr. Bakhit. Huffman also conceded that he received a letter from Sherida Davis-Byran dated November 7, 2016, in response to a letter from his mother. (Plaintiff's Exhibit No. 18A (Docket Item No. 73-22)). This letter advised him to use the Offender Grievance Procedure to address his concerns over his medical treatment.

Huffman's wife, Suzanne Cole Landes, also testified at the evidentiary hearing. Landes testified that Huffman had his pain level under control in 2015 before he became incarcerated. She said that he had no bladder control issues at that time and that he had never had complaints of numbness in his groin area or impotence before being incarcerated. Landes said that she had written letters and made telephone call to various VDOC officials, both at PSCC and in Richmond, in an effort to obtain treatment for her husband.

Huffman's mother, Shirley Huffman, testified that Huffman had suffered from PNE for about 20 years. She said the conditions had caused him pain and bladder problems in the past. She, too, testified that she had contacted various VDOC officials, both at PSCC and in Richmond, in an effort to obtain treatment for her son. She conceded on cross-examination that her son was totally disabled before being incarcerated.

Defendant Henry Ponton, Jr., the VDOC Operations Chief for the Western Region, also testified. Ponton said that he was responsible for the 12 VDOC correctional institutions in the western portion of Virginia, including PSCC. Ponton testified that he was aware of Huffman's ongoing medical issues because he had spoken to Huffman's mother about them in March 2017. Ponton said that he was not a medical professional and that he turned over the information about Huffman to the Assistant Warden at PSCC. Ponton testified that medical services are provided to VDOC inmates pursuant to the Health Services Policy. He said this policy did include a formulary, a list of medications available to VDOC physicians to treat inmates. Ponton said that he did not know whether there were any narcotic pain medications on the VDOC formulary, but there was no VDOC policy stating that narcotics could not be prescribed at PSCC.

Ponton testified that all outside medical referrals had to be approved by Health Services. He said all requests for medical devices for inmates had to be approved by Health Services, Security and the Unit Head at the particular prison. Ponton said that a request for Huffman to receive a donut cushion came to him, and he approved it on February 24, 2017. Ponton said that a denial of a medical referral or device could be appealed through the Grievance Procedure. He said that inquiry letters, whether from inmates or their family members, are not treated as part of the Grievance Procedure.

Defendant Barry Marano, the VDOC's Americans with Disabilities Act Coordinator, also testified. Marano admitted that he was aware of Huffman's medical issues because he had spoken to Huffman's mother and received copies of letters written on Huffman's behalf. Marano said that he personally spoke to Sue Yates, the Medical Authority at PSCC, about obtaining a donut cushion for Huffman in the summer of 2016. Marano said he was told that the Medical Department would consider the request. He said he also heard that the request was denied initially, but had been appealed. Marano said that he was not involved in the decision as to whether a requested device was medically necessary for an inmate.

Defendant Major Richard Bishop, the Chief of Security at PSCC, also testified. Bishop testified that he did not recall ever receiving a written request for a donut cushion for Huffman in November 2016. He said usually the Medical Department would telephone and speak to him about such requests. He said that he did speak with Yates about Huffman's need for a donut cushion on December 22, 2016. He said that Yates told him that the cushion was just a recommendation, but was not medically necessary. Bishop said that allowing a VDOC inmate to carry a

pillow or cushion around raised security concerns because it could be used to conceal contraband. Bishop said that, in his 22 years with the VDOC, he had seen many medical devices, such as crutches, walkers and canes, used to conceal contraband. Bishop said that, if the medical specialist at VCU had recommended a donut cushion for Huffman, the documentation was never provided to him.

Bishop testified that it was PSCC policy and procedure to house inmates prescribed narcotics in the Medical Department and not in general population. Bishop said that this was because inmates could "cheek" pills in their mouths and give or trade them to other inmates. Bishop also said that an inmate on narcotics could be injured by falling from the top tiers or on the stairs. He conceded, however, that inmates on psychotropic medications were not housed in the Medical Department.

Defendant Stephen Herrick, the VDOC Director of Health Service, also testified. Herrick stated that he was the person in the VDOC who supervised all the health care provided to inmates. Herrick said that requests for medical referrals or devices for inmates would go to the VDOC Medical Director, Dr. Mark Amonette, for approval. Herrick said that the cost of a medical referral was not considered in deciding whether to make a referral or not. He said almost everything that is recommended by an inmate's attending physician is approved. Herrick said that the attending physician must first recommend the medical referral, and then it was forwarded to Dr. Amonette for approval. Herrick said that he was not involved in the medical referral approval process.

Herrick admitted that he had sent Landes, Huffman's wife, an email on February 16, 2017, saying that Dr. McCarthy had determined that a donut cushion

was not medically necessary for Huffman. (Plaintiff's Exhibit No. 24 (Docket Item No. 73-33)). Herrick stated that he received an email from VDOC Nursing Director Christy that informed him that all medical recommendations had been followed and that a donut cushion was not medically necessary. Herrick said that he did not make any decisions about what treatment was medically necessary for an inmate, and he did not interfere with the physicians' medical decisions. He said that he never spoke with Dr. McCarthy about Huffman's medical care, and he never reviewed any of Huffman's medical records. Herrick said that if Christy told him that the cushion was not medically necessary after Dr. McCarthy had, in fact, ordered it, then the information he had received was incorrect.

Herrick said that he was not aware of any regular grievance filed by Huffman that was appealed to Level II. Herrick admitted, however, that he would never see a grievance that was rejected at the intake stage.

Herrick also testified that there was no VDOC policy against narcotic use at PSCC, and that there was no VDOC policy against the use of narcotics to treat inmates held in general population. He said narcotics, including hydrocodone and Ultram, were on the VDOC formulary to be prescribed to inmates. He also testified that there was no VDOC policy prohibiting a referral for pain management or prohibiting the use of cushions.

Defendant Dr. Matthew McCarthy, D.O., testified that he had been the attending physician at PSCC since March 2015. Dr. McCarthy testified that the neurologist recommended a donut cushion for Huffman on November 18, 2016, and he ordered the cushion for Huffman on November 21, 2016. He said that security denied the request to provide Huffman with a cushion multiple times and

that he could not overrule security's decision. He said that he also wrote an order for Huffman to receive a referral to a pain management specialist on April 10, 2017.

Dr. McCarthy testified that the VDOC formulary was a list of medications that were preapproved that the physicians could prescribe for inmates. Dr. McCarthy admitted that, if needed, he could prescribe narcotic pain medication for inmates at PSCC. In fact, he testified that Ultram, which Huffman had recently started taking, was a narcotic. Nonetheless, he said that the use of narcotics with inmates was very challenging because of the risk the medication would be diverted for abuse. He said that security officials at PSCC had never let him place an inmate who was taking narcotics in general population. Dr. McCarthy said that Huffman repeatedly asked him to prescribe narcotic pain medication for him.

Dr. McCarthy stated that, although PNE was a rare condition, he routinely treated patients for neuropathic or nerve pain. Dr. McCarthy stated that he believed that Huffman did suffer from PNE. He said that PNE was very difficult to treat and that usually pain management would treat PNE with long-term narcotic use. He said that there was not a cure for PNE and, therefore, all treatment was palliative, or designed to minimize the patient's symptoms. Dr. McCarthy said that, while Ultram should help with Huffman's pain levels, it would not prevent incontinence, impotence or numbness. Dr. McCarthy admitted that most of his conversations with Huffman were centered around his complaints of pain, and he said that he treated Huffman for chronic pain, even though he never documented a pain scale. He said that he saw Huffman approximately every month.

Dr. McCarthy denied that he ever told Huffman that Dr. Bakhit lost his license or closed his clinic. He also said that he did not schedule referrals to specialists. Those referral appointments were made at PSCC by the Health Authority, Yates. He said that it was hard to find specialists to see inmates. He also said that referral appointments could take a long time because "things happen slowly at DOC."

Dr. McCarthy testified that the Medical Department at PSCC had four infirmary beds and two reverse isolation cells.

Dr. McCarthy said that he never spoke with Herrick, Nurse Christy or Major Bishop regarding Huffman's request for a donut cushion or referral to a pain management specialist.

Sue Yates, R.N., the Health Authority at PSCC, also testified that either she or her assistant was responsible for scheduling all inmate referral appointments. Yates testified that she and Nurse Christy discussed Huffman's need for a donut cushion in February 2017. She also said that security at PSCC would sometimes deny a requested medical appliance.

Yates said that Huffman's referral to a pain specialist took so long because she thought the neurologist, Dr. Mehndiratta, was making the referral and scheduling the appointment. Yates said that, when she had not heard anything from VCU about a date for a pain management appointment, she contacted VCU on February 21, 2017. Yates said that she was informed on March 20, 2017, that there was no pain management specialist at VCU and, therefore, Yates would have to look elsewhere for treatment of Huffman.

Yates specifically denied ever speaking to Major Bishop and telling him that a donut cushion was not medically necessary for Huffman. Yates said that she emailed Nurse Christy on November 15, 2016, and informed her that a donut cushion for Huffman had not been ordered. She said that she did not speak to Christy about it again until February 24, 2017, when Christy asked if they could look at other options.

Yates said that it was PSCC policy that all inmates taking narcotic medications were housed in the Medical Department. She said that she implemented this policy because dispensing narcotics raised safety concerns based on an inmate's altered mental state. Yates said that the limited bed space in the Medical Department at PSCC did not prevent Dr. McCarthy from prescribing narcotics for more than four inmates at a time because inmates could be transferred to another facility.

Benjamin J. Riffe, a PSCC casework counselor, also testified at the evidentiary hearing. Riffe testified that he was Huffman's counselor and taught the re-entry class Huffman took in March and April 2017. Riffe stated that Huffman attended and completed the eight-week course. He said that he allowed Huffman to stand as necessary while attending the class. Riffe stated that he would usually see Huffman at least twice a day at PSCC. He said that, although Huffman had recently been given a donut cushion to use, he had never seen Huffman carrying the cushion with him. Riffe said that he probably saw Huffman a couple of times a week in the dining hall, which has metal stools attached to metal tables. He said he had never seen Huffman using his donut cushion to sit in the dining hall.

Sergeant Catherine Sturman testified that she was the commanding officer of PSCC B Building and was very familiar with Huffman. She said that she saw Huffman every day that she worked. Sturman said that she would often see Huffman walking normally around an outdoor track at PSCC. She also said that PSCC inmates receive clean clothes and linens every Monday. She said that, to her knowledge, Huffman had never requested extra sheets or clothing. She also said that prison records showed that he had never requested additional laundry and that he had not bought additional underwear from the commissary. She said that Huffman also had never requested adult diapers or bed padding. She said that she had never smelled urine or seen urine on Huffman's clothing. She also said that she had never seen him wash his own laundry in his cell.

Sturman said that PSCC performs routine, random cell searches of three cells each day. She said that Huffman's cell was searched on May 18, 2017, but that it came up in the random draw to be searched and was not searched because he had filed this lawsuit. She said that Huffman never complained to her about the condition of his cell after the search. She said that she did see trash, including saltine boxes and toilet paper, on the floor of his cell after the search, but she did not see any legal documents strewn about the cell with food dumped on top of them.

Sturman stated that Huffman had been provided with a donut cushion, which he was allowed to carry throughout the prison. She said, however, that she has never seen him carry the cushion or use it to sit on in the dining hall.

Four inmate witnesses also testified at the evidentiary hearing. One of these, Glen Allen Breeding, testified that he suffered from osteoarthritis while housed at

PSCC. Breeding said he saw Dr. McCarthy on three occasions from May to November 2016. He said that Dr. McCarthy performed no physical examination and offered him no treatment other than antidepressant medication and ibuprofen. Breeding said Dr. McCarthy told him that he could offer him no other treatment for his chronic pain due to VDOC policy.

Inmate Michael J. Formica testified that he had suffered a severe injury to his right arm prior to being transferred to PSCC. Formica said that Dr. McCarthy told him that it appeared that he had a torn tendon, but VDOC would not pay for an MRI that was necessary to diagnose his problem because it was against "policy." Formica said the condition was painful, and the only treatment Dr. McCarthy offered him was naproxen sodium, an anti-inflammatory medication.

Inmate Barney B. Snider testified that, while he was housed at PSCC, he held a prison job assisting older inmates. Snider said that during this time, he helped care for inmate William Whitley before his death last year. Snider said that Whitley was in a lot of pain before his death, which, in his opinion, was not adequately treated.

Inmate David Webb testified as to the condition of Huffman's cell after it was searched on May 18, 2017.

## II. Analysis

With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to

any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, *Ky.,* 93 F.3d 230, 233 (6th Cir. 1996). When a motion for summary judgment is made and is properly supported by affidavits, depositions or answers to interrogatories, the nonmoving party may not rest on the mere allegations or denials of the pleadings. *See Oliver v. Va. Dep't of Corrs.*, 2010 WL 1417833, at *2 (W.D. Va. Apr. 6, 2010) (citing FED. R. CIV. P. 56(e)). Instead, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. *See Anderson*, 477 U.S. at 256-57.

The Prison Litigation Reform Act of 1995, ("PLRA"), requires a prisoner to exhaust any available administrative remedies before challenging prison conditions in federal court. *See* 42 U.S.C.A. § 1997e(a) (West 2012). It provides as follows: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are

exhausted." 42 U.S.C.A. § 1997e(a). Exhaustion is mandatory under § 1997e(a), and courts have no discretion to waive the requirement. *See Woodford v. Ngo*, 548 U.S. 81, 85 (2006) (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)); *Porter v. Nussle*, 534 U.S. 516, 524 (2002). "[F]ailure to exhaust is an affirmative defense under the PLRA" and, therefore, must be both pled and proven by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007). A prisoner must exhaust administrative remedies even where the relief sought, such as monetary damages, cannot be granted by the administrative process. *See Woodford*, 548 U.S. at 85 (citing *Booth*, 532 U.S. at 734). The Supreme Court has instructed that the PLRA "requires proper exhaustion." *Woodford*, 548 U.S. at 93. Proper exhaustion of administrative remedies for PLRA purposes means using all steps that the agency holds out, and doing so properly, so that the agency addresses the issues on the merits. *See Woodford*, 548 U.S. at 90. Therefore, in order to satisfy the exhaustion requirement, the inmate must file a grievance raising the claim and pursue the grievance through all available levels of appeal, prior to bringing his action to court. *See Woodford*, 548 U.S. at 90. Thus, before Huffman may proceed with his claims in this court, he must first have exhausted the administrative remedies available to him through the VDOC pursuant to OP 866.1. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). "[W]hen prison officials prevent inmates from using the administrative process …, the process that exists on paper becomes unavailable in reality." *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

Here, the defendants have asserted this affirmative defense in their respective answers and have supported their argument on this ground through an affidavit from Smalling. Huffman and Smalling both testified on this issue at the

June 26-27 evidentiary hearing. As set forth in detail above, the VDOC has a grievance procedure for inmates who seek to challenge their conditions of confinement. This grievance procedure requires complete exhaustion. In particular, the procedure requires that an inmate appeal a decision on the merits of his grievance to the highest available level before he has exhausted his administrative remedies. Also, the procedure specifically states that, if an inmate's grievance is rejected at intake, he must resubmit the issue to exhaust his administrative remedies.

A review of Huffman's Grievance File at PSCC reveals that he has not properly filed and exhausted any grievances relevant to his pending § 1983 claims against the defendants. Specifically, with the exception of one regular grievance, all that Huffman has filed are informal complaints. He did not file any follow-up regular grievances with regard to these informal complaints. The only regular grievance Huffman did file was rejected at intake as being untimely. This intake decision was upheld by the Regional Ombudsman, which constituted a final decision on the intake refusal.  Furthermore, Huffman does not allege that he was unaware of the proper grievance procedure, Smalling testified that all inmates, including Huffman, were oriented to the proper grievance procedure when they are received into the VDOC.

For all of these reasons, I find that there is no genuine dispute of material fact that Huffman did not exhaust his administrative remedies with regard to his § 1983 claims that the defendants violated his Eighth Amendment rights by failing to provide adequate medical treatment for his PNE.

Also, I find that there is no genuine dispute of material fact that defendant Ponton played no role in the denial of medical treatment to Huffman. Other than evidence that Ponton was aware of Huffman's medical complaints, Huffman has produced no evidence that Ponton was deliberately indifferent to his serious medical needs. In fact, the evidence produced shows that Ponton passed on the complaints about Huffman's medical treatment to officials at PSCC to address. Therefore, I will enter summary judgment in the defendants' favor on these claims.

Based on my findings with regard to Huffman's failure to exhaust his administrative remedies, I will deny his requests for injunctive relief. While the court will not address Huffman's claims on their merits, the court has included a summary of the evidence before it in hopes that those at the VDOC who control the provision of medical care to its inmates will take note of the delays encountered by Huffman and endeavor to prevent such delays in the future.

ENTERED: September 29, 2017.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE